IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE GUARANTEE COMPANY OF NORTH AMERICA USA, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. **3:20-CV-3366-L** |
| RKM UTILITY SERVICES, INC.; SHI MACHINERY, LLC; KMR TRANSPORTATION, LLC; 2105 WATERVIEW REALTY, LLC; and RYAN DOWDY, | § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff's Motion for Preliminary Injunction ("Motion") (Doc. 10), filed by The Guarantee Company of North America USA ("Guarantee" or "Plaintiff" or "Surety") on December 18, 2020. After considering the Motion, the parties' briefs, evidence, and pleadings, the court **denies** the Motion (Doc. 10) for the reasons herein explained.

## I.    Factual and Procedural Background

On November 11, 2020, Guarantee brought this action as a surety against RKM Utility Services, Inc. ("RKM"); SHI Machinery, LLC ("SHI"); KMR Transportation, LLC ("KMR"); 2105 Waterview Realty, LLC ("2105 Waterview"); and Ryan Dowdy ("Mr. Dowdy"). Except for Mr. Dowdy, the court refers to all Defendants in this case collectively as "Defendants" or "Indemnitors." Plaintiff seeks indemnity, equitable relief, and other relief against Defendants, as "Indemnitors of a General Agreement of Indemnity" ("Indemnity Agreement" or "Agreement") executed on August 16, 2007, by RKM, SHI, and Mr. Dowdy. Riders to the Indemnity Agreement

**Memorandum Opinion and Order-Page 1**

were executed by 2105 Waterview on April 17, 2018, and KMR on June 26, 2019, adding 2105 Waterview and KMR as additional Indemnitors under the Indemnity Agreement.

Guarantee asserts claims for breach of the Indemnity Agreement; specific performance of the Indemnity Agreement; common law indemnity; exoneration; and collateralization or *quia timet*.[1] Guarantee's Original Complaint also includes a request for a preliminary injunction against Defendants, which it contends is necessary to prevent it from suffering irreparable harm and to preserve the status quo while this action is pending. Plaintiff summarizes the relief it seeks in this action as follows:

(a)  For entry of a preliminary injunction and permanent injunction for the following relief: (1) that Indemnitors be required to specifically perform their obligation to deposit cash collateral with the Surety in the minimum amount of $6,400,000 to reimburse the Surety; (2) that Indemnitors provide the Surety with access to their books and records; (3) prohibiting Indemnitors (or any person on behalf of or directed by Indemnitors) from altering, modifying, destroying, and/or tampering with Indemnitors' books and records; and (4) prohibiting Indemnitors (or any person on behalf of and/or directed by the Indemnitors) from transferring, conveying, or selling any of their assets without prior written consent or approval of the Surety;

(b)  For the entry of judgment compelling Indemnitors to specifically perform their obligation to reimburse and collateralize the Surety in the minimum amount of $6,400,000, which is the amount determined by the Surety as sufficient to discharge any losses, and compelling Indemnitors to provide the Surety with immediate access to books and records;

(c)  For the entry of judgment against the Indemnitors in an amount sufficient to fully exonerate, indemnify, and save the Surety harmless from and against all loss as required by the Indemnity Agreement;

(d)  Judgment against Indemnitors for the Surety's reasonable attorneys' fees and expenses;

(e)  Judgment against Indemnitors for all costs of court;

---

[1] *Quia timet* is: "[a] legal doctrine that allows a person to seek equitable relief from future probable harm to a specific right or interest." *Liberty Mut. Ins. Co. v. CL Carson, Inc.*, A-11-CA-543-SS, 2013 WL 12392522, at *1 (W.D. Tex. June 19, 2013) (quoting Black's Law Dictionary (9th ed. 2009)).

(f)     Judgment against Indemnitors for prejudgment and post judgment interest at the highest rate allowed by law; and

(g)     For such further relief, both general and specific, as may be deemed appropriate by this Court.

Pl.'s Orig. Compl. 15.

In support of its request for injunctive relief, Plaintiff alleges as follows in its Motion regarding the losses it contends are covered by the Indemnity Agreement and Riders but have yet to be paid by Defendants:

In reliance upon its rights under the Indemnity Agreement, the Surety executed numerous construction surety performance, payment, and maintenance bonds ("Bonds") on behalf of or at the request of Indemnitors for construction projects throughout the State of Texas ("Projects"). After executing the Bonds, the Surety began to receive notices of claim for payment under the Bonds from several of RKM Utility's subcontractors and suppliers on the respective projects. These subcontractors and suppliers sought payment for work they performed and/or materials they delivered to the Projects. To date, the Surety has established a reserve of over $8,000,000 to cover claims against the Bonds and incurred losses of over $6,500,00.00 to resolve those claims, including fees and expenses of approximately $175,000 incurred to investigate the claims. Specifically, the Surety has received claims on the Bonds listed in the table included in the Appendix as Exhibit 6.

Pl.'s Br. 3 (footnotes omitted).  The amount of the losses claimed or sustained form the basis for Plaintiff's request for injunctive relief, as well as its request to recover monetary damages in this action as a result of Defendants' failure to perform their payment obligations under the Indemnity Agreement.

On November 24, 2020, Mr. Dowdy filed a Notice of Bankruptcy (Doc. 6).  The next day, Plaintiff filed its Notice of Partial Dismissal of Claims Against Ryan Dowdy pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). Accordingly, Mr. Dowdy is no longer a party to this action.

On December 4, 2020, RKM and 2105 Waterview filed a joint Answer.  SHI and KMM have yet to file an answer. Defendants, however, did file a joint response in opposition to the

Motion for Preliminary Injunction that Plaintiff filed on December 18, 2020.[2]  In its Motion, Plaintiff requests the same injunctive relief as set forth in its earlier Complaint.  For the reasons that follow, the court determines that issuing a preliminary injunction that includes the injunctive relief sought Plaintiff is not appropriate based on the facts of this case.

## II.    Standard for Preliminary Injunction

There are four prerequisites for the extraordinary relief of a preliminary injunction. A court may grant such relief only when the movant establishes that:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the defendant[s]; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order can be granted. *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if a party fails to meet any of the four requirements, the court cannot grant the preliminary injunction.

## III.    Analysis

Plaintiff contends that it is entitled to a preliminary injunction requiring Defendants to "provide the Surety with access to their books and records" and require Defendants to "specifically perform their [contractual] obligation to deposit cash collateral with the Surety in the minimum

---

[2] The court originally delayed ruling on the Motion in light of questions it had regarding subject matter jurisdiction. Those issues, however, were adequately addressed in and resolved by Plaintiff's Amended Complaint (Doc. 16). Plaintiff's Amended Complaint does not include any new claims or requests for relief that differ from the claims and relief sought in its Original Complaint.

amount of $6,400,000 to reimburse Surety" for its losses, which Plaintiff refers to as "post[ing] collateral." Pl.'s Br. 1, 13.

A.      **Whether There is a Substantial Likelihood of Plaintiff's Success of the Merits**

The thrust of Plaintiff's argument is that Defendants agreed to "reimburse and *collateralize*" the surety (Guarantee) upon demand, and by executing the Indemnity Agreement, they "'confirm[ed] and acknowledge[ed] that [Guarantee as] the Surety is entitled to injunctive relief for specific performance' of their indemnity and *collateral* obligations." Pl.'s Br. 1-2 (emphasis added).

Plaintiff is correct that the Indemnity Agreement provides and Defendants "agree[d] to pay to Surety ***upon demand*** . . . [a]ll loss, cost and expenses of whatsoever kind and nature" and "[a]ny amount sufficient to discharge any claim made against Surety on any Bond" in an amount deemed sufficient by the Surety to protect it from loss. Pl.'s App. 6 (emphasis added). The Indemnity Agreement further provides that the sum paid by Defendants "may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond." *Id*. The court, however, does not read Guarantee's option of holding any payments as collateral security as a "collateral obligation" or requirement that Defendants "collateralize" Guarantee under the Indemnity Agreement.

Defendants, instead, agreed to pay Guarantee "**upon demand**" for losses in an amount determined and demanded by Guarantee. While the Indemnity Agreement gave Guarantee the option of using any money demanded and paid by Defendants to pay claims or hold the money as "collateral security," this option does not obligate Defendants to "collateralize" Guarantee or provide it with collateral in the amount demanded by it under the section of the Agreement titled "INDEMNITY TO SURETY." *Id.* at 6. Rather, a separate section of the Agreement titled

"SECURITY TO SURETY" sets forth Defendants' obligation to provide "collateral security to Surety," but only in the form of providing Guarantee with an assignment of their rights for such things as contracts, equipment, cash, bank accounts, licenses, claims, and partnership interests, and their obligation in this regard would only be enforceable if they defaulted under the Indemnity Agreement. *Id.* at 7.

Plaintiff acknowledges that Defendants' payment obligation is only triggered under the Indemnity Agreement upon demand by Guarantee because it alleges in its pleadings and asserts in its Motion that it demanded payment in accordance with the Indemnity Agreement, but Defendants failed to pay upon demand. For support, Plaintiff relies on the declaration of Jeffrey Jubera, the Vice President of Claims for Guarantee, who states, based on a September 24, 2020 letter from Guarantee to Defendants, that Guarantee "demand[ed]" that Defendants "collateralize and reimburse" it against losses incurred as a result of executing bonds, but Defendants failed to respond to its "demand." Pl.'s App. 3.

Mr. Jubera does not specify the amount demanded, and, contrary to Plaintiff's and Mr. Jubera's assertion, the September 24, 2020 letter attached to Mr. Jubera's declaration does not include a demand for payment in any amount. The letter, instead, simply: (1) states that its "purpose . . . is to address the obligations of the Indemnitors under the [Indemnity Agreement] including their obligation to reimburse the Surety for loss already incurred on the Bonds"; (2) quotes the contract language requiring Defendants to pay Guarantee "upon demand" and notes that failure to pay qualifies as an "Event of Default" under the Agreement; and (3) "requests a meeting with the Indemnitors to discuss their collective plan of action for reimbursing the Surety for the loss pursuant to their obligations under the [Indemnity Agreement]," which the letter indicates is "$6,772.641.83." *Id.* at 17-18. Nowhere in this letter is there a "demand" for payment by

Guarantee in the amount of "$6,772.641.83," which appears to be a typographical error, or any other amount. Absent evidence that Guarantee demanded $6,400,000, the amount sought in its pleadings and Motion, Plaintiff has not demonstrated its likelihood of succeeding on the merits of its claims in this action that pertain to the parties' rights and obligations under the Indemnity Agreement.

As noted, Plaintiff also requests access to Defendants' books and records and contends that it is entitled to such access under the Indemnity Agreement. Defendants respond that, pursuant to a separate funds control agreement, they essentially turned over all financial control and oversight of their construction operation to Guarantee and, as a result, it obtained and continues to have regular access to Defendants' financial records. Defendants further assert that Plaintiff and its counsel are fully aware that all equipment and property of Defendants is already pledged as collateral to other perfected lenders and has been foreclosed upon, seized, or in the process of being seized by secured lenders. Plaintiff replies that its right to "free access" of all books and records under the Indemnity Agreement is different or distinct from its right to access books and records under the funds control agreement referenced by Defendants.

The Indemnity Agreement does provide Plaintiff with "the right to free access at reasonable times to the books, records, and accounts of each of the Indemnitors for the purpose of examining, copying, or reproducing them." Pl.'s App. 8. It is unclear, however, from Plaintiff's pleadings, briefing, and evidence whether it ever requested or was denied such access. Without evidence that it was denied access, there is no basis for concluding that Plaintiff is substantially likely to succeed on the merits of any claim for breach of the Indemnity Agreement on this ground. Additionally, Plaintiff can obtain this information through discovery and, thus, there is no indication that there

is a substantial threat irreparable harm will result if an injunction is not granted requiring Defendants to provide access to their books and records.

### B.      Whether There is a Substantial Threat of Irreparable Harm to Plaintiff

Plaintiff argues that it will suffer irreparable injury through the permanent loss of its contractual rights to "indemnity and collateralization" if the requested injunctive relief does not issue.  Pl.'s Br. 8.  Plaintiff contends that Defendants' agreeing to include the following language in the Indemnity Agreement satisfies the second irreparable harm requirement for injunctive relief: "The Indemnitors acknowledge that their failure to pay, immediately ***upon demand***, that sum demanded by Surety will cause irreparable harm for which Surety has no adequate remedy at law." Pl.'s Br. 2 (quoting Pl.'s App. 6) (emphasis added).

A preliminary injunction, however, is an "extraordinary and drastic remedy" that "should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of State of Fla.*, 489 F.2d at 573. For this reason, some courts, including the undersigned, have concluded that a stipulation of irreparable harm in a contractual agreement is insufficient to support a finding of irreparable harm to justify the imposition of a preliminary injunction. *See, e.g., Tex. Health & Human Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 712 (N.D. Tex. 2016); *Dickey's Barbecue Restaurants, Inc. v. GEM Investment Grp., LLC*, 2012 WL 1344352, at *4 (N.D. Tex. Apr. 18, 2012) (quoting *Traders Int'l, Ltd. v. Scheuermann*, 2006 WL 2521336, *8 (S.D. Tex. Aug. 30, 2006)).  In any event, Plaintiff's evidence does not establish that it made a demand for payment on Defendants in accordance with the Indemnity Agreement.  Thus, the irreparable harm language in the Agreement relied on by Plaintiff does not come into play or support a finding of irreparable harm.

In response to Defendant's contention that it will not suffer irreparable harm because a money judgment will be available if it prevails, Plaintiff attempts to distinguish its claims from those in which a money judgment is available for run-of-the-mill breach of contract claims. According to Plaintiff, a money judgment does not prevent a surety from suffering irreparable harm when an indemnitor refuses to meet its "collateral obligations" because, in the absence of injunctive relief requiring the indemnitor to provide "security on demand" as agreed upon, the surety will suffer permanent loss of its bargained-for right to specific performance in the form of security on demand.  For support, Plaintiff relies on a May 19, 2020 opinion entered by United States District Judge Amos L. Mazzant, III in *Philadelphia Indemnity Insurance Company v. RKM Utility Services, Incorporated*, Civil Action No. 4:19-CV-676.  *See* Pl.'s Reply (citing Defs.' App. 32-33).

This argument fails for the reasons already explained in discussing Plaintiff's likelihood of succeeding on the merits of its claims.  As noted, the court disagrees that the Indemnity Agreement in this case requires Defendants to provide Guarantee with "security on demand" or collateral in the form of payment upon demand for losses incurred.  Instead, the Agreement contains a separate section dealing with "collateral security to Surety" that is limited to the assignment, in the event of Defendants' default, of certain interests and rights.  Pl.'s App. 7.  The Agreement also includes another provision that sets forth "SURETY'S REMEDIES IN EVENT OF DEFAULT" and allows Guarantee, among other things, to take possession of work under contracts; assume all rights under Defendants' contracts; assume licenses/patents; and assert and prosecute claims against Defendants.  Thus, "collateral security' under the parties' Agreement is not synonymous with the requirement that Defendants make payments for losses upon demand by Guarantee.

Accordingly, the parties' Agreement does not support Guarantee's assertion regarding the parties' rights and obligations; nor does the Agreement support Guarantee's contention that it will suffer irreparable harm if the court does not order Defendants to pay $6,400,000 immediately as injunctive relief, which is the same amount of damages that it seeks to recover for its claims of breach of contract and specific performance in this case.

Further, ordering Defendants to pay $6,400,000 now as injunctive relief would not, as Plaintiff contends, preserve the status quo pending resolution of the parties' claims and defenses in this case. Instead, such an order would essentially award all money damages sought by Plaintiff in this action under the guise of injunctive relief before it has established its entitlement to such relief as the prevailing party. If the court were to proceed in this manner, there would be no point in the case continuing, except for purposes of determining whether Plaintiff is also entitled to recover attorney's fees and expenses and interest on any amount awarded.

Finally, Plaintiff argues for the first time in its reply that Defendants' insolvency or inability to pay a money judgment strengthens its showing of irreparable harm:

> Contradicting their position that a money judgment is available, Indemnitors also argue that an injunction would be pointless because they have no money or assets to post collateral. Indemnitors emphasize Ryan Dowdy's declaration that neither he, RKM, nor SHI Machinery have sufficient assets to comply with the Eastern District of Texas' prior injunction.

Pl.'s Reply 4 (footnotes omitted). Plaintiff contends that similar evidence of a "party's possible inability to pay a post-trial judgment [has been] found sufficient to constitute irreparable harm." *Id.* (quoting *Radius Bank v. Stafford Transport of Louisiana, Inc.*, 2020 WL 3129639 at *4 (N.D. Tex. 2020) (citing *Texas Black Iron, Inc. v. Arawak Energy Int'l, Ltd.*, 527 S.W.3d 579 (Tex. App.— Houston [14th Dist.] 2017, no pet.); and *RWI Construction, Inc. v. Comerica Bank*, 583 S.W.3d 269 (Tex. App.—Dallas 2019, no pet.)).

**Memorandum Opinion and Order-Page 10**

"[A] plaintiff's inability to obtain monetary compensation from an insolvent defendant" may constitute irreparable harm. *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 n.56 (5th Cir. 2014) (citing *Molex, Inc. v. Nolen*, 759 F.2d 474, 477 (5th Cir. 1985)). Arguments such as this, though, that are made for the first time in a reply are generally not appropriate for consideration. *Perez v. Bruister*, 823 F.3d 250, 273 n.31 (5th Cir. 2016) (citation omitted). The court, therefore, declines to consider Plaintiff's insolvency argument in determining whether it is entitled to the injunctive relief requested or is likely to suffer irreparable harm if its Motion is denied.

Moreover, the court does not interpret Defendants' response—that they "Do Not Possess Funds or Other Property *to Respond to Guarantee's Motion*" or funds to "*respond to Guarantee's pre-judgment request* currently advanced before the Court and mischaracterized as 'injunctive' relief, even if granted by this Court"—in the same way Plaintiff suggests. Defs.' Resp. 9. Whether Defendants lack funds to comply with a *prejudgment* preliminary injunction order requiring them to immediately pay the amount sought by Plaintiff (in this case or the case against them in the Eastern District of Texas) is quite different from whether they will be able to satisfy a judgment *postjudgment*, if one is entered against them in this case.

### C.    Remaining Requirements for a Preliminary Injunction

Regarding the last two requirements—whether the threatened harm to Plaintiff outweighs the harm to Defendants and whether granting the preliminary injunctive relief sought by Plaintiff will not disserve the public interest—Plaintiff contends that the balance of harms weighs in its favor because it will suffer irreparable harm, whereas Defendants will simply be required to do what they already agreed to do under the Indemnity Agreement. In addition, Plaintiff contends that granting the relief it seeks will further the public interest in seeing that contractual agreements

between parties are upheld and surety companies remain solvent.  The court disagrees and determines that its discussion of various matters so far supports contrary findings as to these requirements for injunctive relief.

Moreover, Plaintiff's Motion and reply brief do not address another potential concern and issue raised by Defendants regarding the effect, if any, of Mr. Dowdy's bankruptcy on them and the proceedings in this case.  The first page of RKM's and 2105 Waterview's Answer alleges as follows regarding Mr. Dowdy's bankruptcy:

> 1.      On November 24, 2020, a voluntary petition was filed by Defendant Ryan Dowdy ("Dowdy") seeking relief under Chapter 7 of the United States Bankruptcy Court for the Eastern District of Texas, under cause no. 20-42346. See Dowdy's Suggestion of Bankruptcy (DN 6).
>
> 2.      Section 362 of the United States Bankruptcy Code stays all actions, including the above-captioned matter, against the Debtor Dowdy and his property.
>
> 3.      Dowdy is the controlling majority owner of the over 95% of the equity interests in both Defendant RKM and 2105 Waterview and, correspondingly, the administration of Dowdy's estate before that U.S. Bankruptcy Court necessarily involves the treatment, management, and operations of those entities. Therefore, the protections afforded under the automatic stay in bankruptcy should be applied to Defendants as well as to Dowdy.

Answer 1-2 (Doc. 8).  In response to Plaintiff's Motion, Defendants similarly assert:

> As previously brought to this Court's attention, Ryan Dowdy filed for bankruptcy relief on November 24, 2020. Ryan Dowdy is the sole shareholder of RKM and the 99% member of 2105 Waterview. As such, Guarantee's Motion necessarily requests that this Court enter an order enjoining and otherwise controlling the activity of and turnover of funds, if any, of two entities owned by a debtor who is the subject of a pending, active bankruptcy proceeding, thereby depleting any value remaining in those assets of the debtor to the detriment of his creditors.

Defs.' Resp. 12 (footnotes omitted).

As noted by Defendants, the filings in Mr. Dowdy's Chapter 7 case allege that he is the sole shareholder of RKM and a 99% member of 2105 Waterview.  RKM is also identified as a

**Memorandum Opinion and Order-Page 12**

codebtor in the bankruptcy.  Generally, codebtors are not protected by the automatic stay, which only bars proceedings against the debtor. *GATX Aircraft Corp. v. M/V COURTNEY LEIGH*, 768 F.2d 711, 716 (5th Cir.1984).  There may, however, be "circumstances whe[n] the debtor and the nonbankrupt party can be considered one entity or as having a unitary interest" such that "a section 362(a)(1) stay may suspend an action against a nonbankrupt codefendant," for example, when the action "seeks to obtain or exercise control over the property of the debtor." *See In re S.I. Acquisition, Inc*., 817 F.2d 1142, 1148-1151 (5th Cir. 1987).  Without further information and briefing by the parties, it is unclear whether RKM and 2105 Waterview fall under this exception. This issue is relevant to the court's analysis regarding the third and fourth requirements for injunctive relief.  As the movant, it was Plaintiff's burden to flesh out this issue, which it has not done to the court's satisfaction.  Accordingly, this too weighs against issuance of a preliminary injunction order containing the relief sought by Plaintiff.

## IV.   Conclusion

For the reasons explained, the court **denies** Plaintiff's Motion for Preliminary Injunction (Doc. 10).

**It is so ordered** this 23rd day of September, 2021.

Sam A. Lindsay
United States District Judge